Joseph Sachs, et al. [1] v. Commissioner. Sachs v. Commissioner
Docket Nos. 89668-89672.
United States Tax Court
T.C. Memo 1963-103; 1963 Tax Ct. Memo LEXIS 242; 22 T.C.M. (CCH) 475; T.C.M. (RIA) 63103; April 8, 1963
*242 Martin M. Merriam, Esq., for the petitioners. Alan L. Swartz, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion Respondent determined the following deficiencies in income tax and additions to tax for the year 1956: Additions to Tax,
I.R.C. 1954
Petitioners
Deficiency
Sec. 6653(a)
Sec. 6654
Joseph Sachs
$10,683.14
$534.16
Ivan and Rita Sachs
7,161.47
358.07
$12.07
Arthur (Abraham) and Shirley Sachs
6,948.29
347.41
21.20
Marvin and Joyce Sachs
7,218.70
360.94
28.63
Herbert Sachs
10,327.45
516.37
22.72
The principal issue is whether gain realized upon condemnation of certain property is entitled to nonrecognition under Section 1033(a)(3)(A) of the 1954 Code. A subsidiary question involves the determination of the ownership of one of the one-quarter interests in that property. Also involved is the question whether amounts received in 1956 for "loam" and "borrow" or "fill" are taxable as ordinary income or as capital gain. Findings of Fact Some of the facts have been stipulated, and, as stipulated, are incorporated herein by reference. All of the petitioners reside at Cherry Hill Farm, *243 Branford, Connecticut. They filed their income tax returns for the taxable year 1956 with the office of the district director of internal revenue for the district of Connecticut. Rita, Shirley and Joyce Sachs are parties to this proceeding because they joined with their husbands in filing joint returns. Joseph Sachs is the father of the other four male petitioners. In 1946, when Ivan, the youngest son was a minor, Joseph and his three other sons acquired 290 acres of land (hereinafter referred to as the Cherry Hill Farm) in Branford, Connecticut, as tenants-in-common. It was Joseph's intention to transfer his interest to Ivan some four years later when Ivan became 21. He did not do so at that time, however, because Ivan "went ont" with girls whom Joseph did not approve, and Joseph was fearful that the property might be "attached" with the consequence that the other brothers might be ruined. On June 21, 1957, upon the advice of counsel, Joseph transferred to Ivan by quitclaim deed all of his interest in the 165 acres of the Cherry Hill Farm remaining after the transfers, hereinafter noted, of 35 acres to Cherry Hill Apartments, Inc. and 90 acres to the State of Connecticut. The quitclaim *244 deed was recorded on June 26, 1957. In 1946, at or about the time the Cherry Hill Farm was acquired, the Sachs Brothers partnership commenced farming operations on this property with Joseph, Arthur, Herbert, and Marvin Sachs as equal partners. Ivan became a member of the partnership in 1951, replacing his father, and the partnership returns filed by Sachs Brothers for the years 1951 through 1956 reflected this change. On or about June 17, 1954, petitioners received notice that the State of Connecticut proposed to condemn a portion of Cherry Hill Farm for highway purposes. In May or June of 1955, they were notified of the exact portion of the property that the State proposed to condemn. Cherry Hill Apartments, Inc. was incorporated in December 1954 by Arthur, Herbert, Marvin and Ivan for the principal purpose of constructing and operating apartment buildings. Since its incorporation each of them has owned 25 percent of its outstanding stock. In May 1955 approximately 35 acres of Cherry Hill Farm held in the names of Joseph, Arthur, Herbert and Marvin were transferred to Cherry Hill Apartments, Inc. During the year 1956 apartment buildings were being constructed on this land. *245 On or about April 10, 1956, the State of Connecticut condemned approximately 90 acres of the Cherry Hill Farm. The portion of the property condemned was vacant and unimproved and did not include any part of the 35 acres transferred to Cherry Hill Apartments, Inc. in 1954. The last activity on the condemned land prior to condemnation was farming. Farming operations on that land ceased about a year prior to condemnation. The basis of the condemned property was $5,130.00. As the result of the condemnation proceeding, the State of Connecticut paid $201,000 to or on behalf of Joseph, Arthur, Herbert and Marvin on or before July 31, 1956. Of this amount $66,000 was retained by the State for the purpose of satisfying a mortgage on the condemned property. Expenses connected with the condemnation amounted to $36,451. The remaining $98,549 of the condemnation proceeds was disbursed as follows: $63,549 "was advanced" to Cherry Hill Apartments, Inc. on August 1, 1956, and $35,000 was deposited in a bank account in the name of Herbert Sachs. Subsequent withdrawals from this account of $5,000 on August 15, 1956, $5,000 on August 20, 1956, $5,000 on August 27, 1956, $5,000 on August 28, 1956, and *246 $2,000 on October 18, 1956 were "advanced to" Cherry Hill Apartments, Inc., and recorded on its books as loans payable. The advances were used by it for general expenses incurred in the construction and operation of apartment buildings on its land. None of the petitioners acquired, in place of the condemned property, any interest in property similar or related in service or use to the condemned property. On October 26, 1955, petitioners Arthur, Herbert, Marvin and Ivan Sachs acquired a parcel of land located on the south side of the Boston Post Road in Branford, Connecticut (herinafter referred to as the Tolman property). The Foxon Trap Rock Company (hereinafter referred to as Foxon) held a contract under which it agreed to furnish and deliver "borrow" (fill) for the construction of a section of the Greenwich-Killingly Highway in the City of New Haven. On November 22, 1955, petitioners Arthur, Herbert, Marvin and Ivan Sachs, as owners, entered into an agreement with Foxon wherein they agreed to sell and Foxon to buy approximately 500,000 cubic yards of "borrow" located on the Tolman property. Foxon agreed to excavate and remove the "borrow" on or before October 1, 1956, and pay *247 the owners for all "borrow" removed from their property "at the rate of five cents per cubic yard measured in place in the bank". During the year 1956, the following payments were made by Foxon pursuant to the agreement to or on behalf of petitioners Arthur, Herbert, Marvin, and Ivan Sachs or Sachs Brothers: 1/26/56
$ 496.44
2/20/56
1,418.53
3/20/56
3,659.94
4/23/56
3,581.69
5/23/56
5,134.95
6/22/56
4,864.95
10/ 1/56
4,256.25
Total
$23,412.75
On June 23, 1956, Sachs Brothers entered into an agreement with D. V. Frione & Company, Inc. (hereinafter referred to as Frione). After reciting that Sachs Brothers owned a diary farm in Branford called "Cherry Hill Farm", Sachs Brothers agreed to sell and Frione to buy approximately 50,000 cubic yards of loam located on that farm at a price of 56 cents per cubic yard. The agreement also provided in part as follows: * * *
(D) Buyer at his expense will excavate and place in temporary stock piles on the Cherry Hill Farm property loam as required and at such times as may suit Buyer's convenience. In as much as Buyer will not have need of this loam before Summer or Fall of 1957 the stripping and stock piling *248 of loam will be carried out to meet the convenience of the Buyer and also to be acceptable to the plans of the Seller. All loam required by the Buyer will be removed from Seller's property before November 1, 1957. * * *
(H) Payment for loam taken by Buyer will be on cubic yardage basis as above described and will be made as follows: With the signing of this agreement Buyer will pay Seller the sum of Five Thousand Dollars ($5,000.00), as a down payment which shall be applied against current estimates until exhausted. As loam is withdrawn from stock piles by Buyer monthly payments will be made to Seller for such quantities as are withdrawn in the form of an estimate payable approximately by the 20th of the month following that month in which loam was removed from stock piles. Ten per cent will be retained. * * *
(J) The Buyer's requirements of 50,000 cubic yards of loam are approximate only and may be higher or lower. Buyer does not warrant to remove any specific quantity of loam, but Buyer will remove all loam possible, meeting conditions here in above described and Buyer simply estimates this volume as approximately 50,000 cubic yards. * * *
During 1956, $5,000 *249 was paid to or on behalf of Sachs Brothers by Frione pursuant to the agreement. In the 1956 partnership return of Sachs Brothers, it reported ordinary income of $17,531.33, consisting of $23,530.00 from the sale of "Fill" less a reported loss from farming operations of $5,998.67. In addition thereto, the partnership received during 1956 income in the amount of $5,000 from Frione, and other income in the amount of $5,052.75. On page 4 of the 1956 partnership return and on the schedule of profit (or loss) attached to that return, "Farm" was stated to be the principal business activity of the partnership. Arthur, Herbert, Marvin and Ivan Sachs each reported on his 1956 Federal income tax return approximately one-fourth of the income reported in the 1956 partnership return of Sachs Brothers. On the page entitled "Computation of Self-Employment Tax" attached to their 1956 returns, each stated that his business activity subject to self-employment tax was that of "Farmer", and each reported as net earnings from self-employment his distributive share of the income reported in the partnership return. Opinion RAUM, Judge: 1. Recognition of gain resulting from condemnation. The gross *250 proceeds from the condemnation of the 90 acres involved herein amounted to $201,000, and after subtracting expenses of $36,451, there remained $164,549 net proceeds which were paid to or on behalf of the owners. Since the basis of the property was $5,130, the profit realized was $159,419. We reject petitioner's contention that such gain is entitled to nonrecognition under Section 1033(a)(3)(A) of the 1954 Code. [2]
The parties have stipulated that "none of the petitioners acquired, in place of the condemned property, any interest in property similar or related in service or use to the condemned property". In the circumstances petitioners, in order to be entitled *251 to nonrecognition, have the burden of proving that, for the purpose of replacing the condemned property, they purchased "stock in the acquisition of control of a corporation" owning property similar or related in service or use to the condemned property. The stipulated facts disclose that shortly after the condemnation award was received in July 1956, amounts totaling $85,549 "were advanced" to Cherry Hill Apartments, Inc. and were recorded on its books as loans payable. This is the only evidence produced which is in any way indicative of the nature of the advances. The record is devoid of any evidence indicating that the advances represented payments made to purchase stock of the corporation or that any stock was acquired by any of the petitioners as a result of the advances. The absence of such evidence is fatal to petitioners' claim for nonrecognition of gain. Accordingly, we do not find it necessary to consider other possible arguments militating against the applicability of Section 1033(a)(3)(A) in this case. 2. Allocation of gain from condemnation among petitioners. There is no dispute between the parties that Arthur, Marvin and Herbert each owned one-fourth of the condemned *252 property and that to the extent that the gain is taxable each is chargeable with one-fourth thereof. However, the parties are in disagreement as to the ownership of the last one-fourth interest. The Government contends that Joseph was the owner, whereas petitioners argue that Joseph merely held his interest for the benefit of Ivan who should be treated as the owner of that one-fourth interest. In the statutory notice of deficiency the Commissioner, in order to protect the revenue, ascribed one-fourth of the gain to each of the five male petitioners, but he concedes that if one-fourth of the gain is properly attributable to Joseph, then it may not be charged to Ivan, and vice versa. At the time the 90 acres were condemned the legal title was held by Joseph, Arthur, Herbert and Marvin Sachs, as tenants-in-common. Although it appears from the evidence that Joseph's intention at the time the farm was originally acquired in 1946 was to transfer his interest in the property to his son Ivan when Ivan reached the age of 21, he did not, for reasons noted in our findings, give Ivan any interest in the property until 1957 when Ivan was 28 years old. And the interest then acquired by Ivan did *253 not include any portion of the 90 acres which had been condemned by the State on April 10, 1956. Joseph was not holding his interest in trust for Ivan, nor does it appear that Ivan had enforceable rights of any kind in the property at that time. Joseph was then one of the four owners of the property and the Commissioner did not err in attributing to him one-fourth of the gain; as a consequence, no part of that gain may be charged to Ivan. 3. Payments received for "loam" and "borrow" or "fill". Petitioners contend that the respondent erred in taxing as ordinary income rather than long-term capital gain a portion [3] of the payments of $23,412.75 received from Foxon in 1956 for "borrow" or "fill" and the payment of $5,000 received from Frione during the same year for "loam". The rule to be applied in determining whether profit realized by a landowner with respect to the removal and sale of dirt, sand, gravel, or *254 any mineral deposit on or in his property is taxable as capital gain or ordinary income was stated by this Court in , to be as follows (at p. 1070): The rule seems to be that where there is in fact a sale of the material "in place", the owner has sold part of his real estate and any profit realized thereby is therefore not disqualified from being regarded as capital gain by reason of the form of the transaction. * * * On the other hand, where the owner does not part with his entire interest in the deposits until removed or where he does not sell part of his property "in place," but in effect merely enters into a lease for the exploitation of his land reserving a royalty with respect to the materials extracted or otherwise merely makes arrangements with a contractor to sell the materials at a unit price from time to time as they are extracted and removed from the property, the transaction has not been considered as a sale of a portion of the land entitling the owner to the benefit of the capital gains provisions. * * * These principles were applied on the same day in another case reported in a memorandum opinion ( ), *255 which was subsequently affirmed by the Court of , certiorari denied, . In the contracts entered into by petitioners with both Foxon and Frione these two contractors were granted the right to excavate and remove from the Cherry Hill Farm earth fill and loam in return for a specified price per cubic yard for the material taken. Under the principles stated above the profit realized by petitioners from these transactions is taxable as ordinary income inasmuch as they did not sell the materials "in place" but merely sold them at a unit price as they were extracted and removed from the property. Moreover, even if the contract with Foxon were to be construed as effecting a sale of the fill "in place", that contract was executed on November 22, 1955, less than one month after petitioners had acquired the parcel in question, and petitioners in any event would not be entitled to treat any of the profit as long-term capital gain. The fact that some of the payments were received after the lapse of six months is of no consequence in this connection; but, if anything, it underscores *256 our basic conclusion that there was in fact no sale of fill "in place", and that petitioners were merely selling the materials at a unit price, pursuant to a master contract, as they were extracted and removed from the property. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Ivan and Rita Sachs, Docket No. 89669; Arthur (Abraham) Sachs and Shirley Sachs, Docket No. 89670; Marvin Sachs and Joyce Sachs, Docket No. 89671; and Herbert Sachs, Docket No. 89672.↩
2. Section 1033(a)(3)(A) provides: (A) Nonrecognition of Gain. - If the taxpayer * * * for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, or purchases stock in the acquisition of control of a corporation owning such other property, at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion * * * exceeds the cost of such other property or such stock. * * *↩
3. Petitioners do not argue that all of the payments from Foxon represent long-term capital gain, since they acquired the tract on October 26, 1955, and the payments for at least the first four installments of the fill sold were made within six months of that date.↩